Private Paul V. WINTERS, Jr., Petitioner-Appellant,

v.

UNITED STATES of America, Major General Louis J. Fields, et al., Respondent-Appellee.

No. 23367.

United States Court of Appeals Ninth Circuit.

May 28, 1969.

Moses M. Falk (argued), New York City, Nathan R. Zahm, Sherman Oaks, Cal., for appellant.

Raymond Zventina (argued), Asst. U. S. Atty., Edwin L. Miller, U. S. Atty., San Diego, Cal., for appellee.

Before BARNES, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

Winters voluntarily enlisted in the United States Marine Corps Reserve (Ready Reserve) on September 24, 1965. He signed an enlistment contract and a "Statement of Understanding" which we quote, in part, in the margin.[1] The reference to 90% attendance was in accordance with Marine Corps Reserve Standard Operating Procedures § 2052, and authorized by § 101.3(c), 25 F.R. 14376 (1960).[2]

After his six months active duty, Winters was attached to a reserve unit in New York City. On August 29, 1967, he missed a double drill. He presented a medical excuse which was found to be fraudulent. Although he had missed less than 10% of his drills for that "anniversary year," he was on December 11, 1967, ordered to involuntary active duty in the Marine Corps for 17 months.

At the time of Winters' enlistment, the only statutes dealing with failing to participate successfully in the reserve program were 10 U.S.C. § 270(b), which authorized additional active duty for

1. The enlistment contract provides:
"40. I understand that upon enlistment * * * I may not be ordered to active duty without my consent except in time of war, or when in the opinion of the President a national emergency exists, or when otherwise prescribed by law, and that I may be required to perform active duty during such periods."
The "Statement of Understanding" provides:
"d. Under current Selective Service Regulations I will not be inducted so long as my participation as a member of the Marine Corps Reserve is satisfactory.
&ast; &ast; &ast; &ast; &ast;
e. I will be required to attend drills and training periods as prescribed, both prior to and following my six month period of active duty for training in order to remain in good standing for purposes of maintaining my proficiency and delay or deferment in call by Selective Service induction.
f. I UNDERSTAND that SATISFACTORY PARTICIPATION consists of ATTENDANCE AT and SATISFACTORY PERFORMANCE of at least 90% of all scheduled drills. * * *
g. I FURTHER UNDERSTAND that if I fail or refuse to perform the training duties required, I may be ordered without my consent to perform

not to exceed 45 days of additional active duty for training, or I may have my draft delay canceled, or my draft deferment canceled, and if so canceled, I may be inducted by the Selective Service System prior to the induction of other persons liable therefor.
h. I DO FURTHER UNDERSTAND that I will be a member of the READY RESERVE throughout my 6 year period of service and that, as such, I am liable for involuntary call to active duty in time of future national emergency proclaimed by the President of the United States and may be required to serve not more than 24 months; and that in time of national emergency or war declared by Congress I may be required to serve for the duration of the national emergency or war and for six months thereafter; or that I may be required to serve at such other times as the law may require."

2. "Criteria established by the Secretaries of the military departments for determining satisfactory performance of training duty by individuals subject to the provisions of section 270 of 72 Stat. 1438, 10 U.S.C. 270, may include consideration of manner of performances of such training duty, but may not permit more than 10 per cent unexcused absence from scheduled drills or training periods. * * *"

training not to exceed 45 days, and 50 U.S.C.App. § 456(c) (2) (D), which authorized cancellation of draft deferment and accelerated induction into the armed services. Neither the enlistment contract nor any statute authorized involuntary duty for more than 45 days, except upon being drafted.

On October 15, 1966, Congress enacted Public Law 89–687, 80 Stat. 980, 981, empowering the President to order to active duty any reservist who was not "participating satisfactorily in a unit of the Selected Reserve." [3] The maximum period for such involuntary duty was 24 months, less credit for active duty time previously served.

On March 15, 1967, the Commandant of the Marine Corps issued M.C. Bulletin 1001R, which abrogated the 90% attendance rule and provided that in the future no unexcused absences from reserve drills would be permitted. The bulletin was clearly intended to apply to men who had already enlisted in the Marine Corps reserve. Winters admits that he knew of the 100% requirement when he missed the double drill on August 29, 1967.

Winters' activation orders were predicated upon his unsatisfactory participation in the reserve program because of the missed double drill, and upon Public Law 89–687. If either M.C. Bulletin 1001R or Public Law 89–687 were inapplicable to appellant because they were issued or enacted after he enlisted, the Marine Corps had no authority to call him to active duty.

On December 29, 1967, before he had reported for active duty, Winters went to court. He filed a complaint for declaratory relief and injunction in the United States District Court for the Eastern District of New York, challenging the validity of the active duty orders. In a comprehensive and well-reasoned opinion filed on February 1, 1968, Judge Dooling held that the orders were valid. 281 F. Supp. 289. The second circuit affirmed per curiam, 390 F.2d 879, and the Supreme Court denied certiorari, 393 U.S. 896, 89 S.Ct. 188, 21 L.Ed.2d 177 (October 14, 1968).

On March 13, 1968, Winters reported to Camp Pendleton, California, for advanced combat training prior to duty in Viet Nam. He continued his legal battles by filing a petition for a writ of habeas corpus in the Southern District of California on April 15, 1968. A few hours before the hearing set for April 16, 1968, in that case, he received orders discharging him from active duty and transferring him back to his former reserve duty. The habeas corpus petition was then dismissed as moot.

Winters duly returned to New York, where on April 29, 1968, less than two weeks later, he received new orders directing him to report for involuntary duty of sixteen months, "by reason of your unsatisfactory participation in reserve training." The orders were based on the same missed double drill of August 29, 1967. The Supreme Court denied his application for reconsideration of application for temporary stay, 390 U.S. 993, 88 S.Ct. 1193, 20 L.Ed.2d 93, on May 20, 1968, and back to Camp Pendleton he went, on May 28, 1968. He was not to give in so easily, however.

---

3.  Public Law 89–687 was later re-enacted as Public Law 90–40, 10 U.S.C. § 673a, which provides as follows:

    "Notwithstanding any other provision of law, the President may order to active duty any member of the Ready Reserve of an armed force who—

    (1)  is not * * * participating satisfactorily in, a unit of the Ready Reserve;

    (2)  has not fulfilled his statutory reserve obligation; and

    (3)  has not served on active duty for a total of 24 months."

    On February 15, 1967, the President issued Executive Order No. 11,327, 32 F.R. 2995, which delegated his authority to "the Secretary of Defense and, when designated by him for this purpose, any of the Secretaries of the military departments of the Department of Defense." This order has now been superseded by Executive Order 11,366, 32 F.R. 11411 of August 4, 1967, which, as it affects Winters, is the same.

After he had completed 45 days of involuntary active duty, he filed a second petition for a writ of habeas corpus, on June 3, 1968. On July 15 the district court dismissed the action on the ground that the New York federal court decision was res judicata. Upon reargument, the court left the dismissal in effect, indicating that "even though it cannot be said that the New York case is res judicata, I would follow that case on its merits."

1. *The effect of the prior New York litigation.*

■ Res judicata is not strictly applicable in habeas corpus, even where the prior decision was also a federal one. Sanders v. United States, 1963, 373 U.S. 1, 7–8, 83 S.Ct. 1068, 10 L.Ed.2d 148. This does not mean, however, that the prior decision is not entitled to great weight. The litigation in the New York federal court was for declaratory relief and injunction, rather than habeas corpus, but the principles stated in Salinger v. Loisel, 1924, 265 U.S. 224, 230–231, 44 S.Ct. 519, 521, 68 L.Ed. 989, which involved successive habeas corpus petitions in three separate districts, are applicable here. The Court said:

> "But it does not follow that a refusal to discharge on one application is without bearing or weight when a later application is being considered. * * * The federal statute [predecessor of 28 U.S.C. § 2241] does not lay down any specific rule on the subject, but directs the court 'to dispose of the party as law and justice may require.' A study of the cases will show that this has been construed as meaning that each application is to be disposed of in the exercise of a sound judicial discretion guided and controlled by a consideration of whatever has a rational bearing on the propriety of the discharge sought. Among the matters which may be considered, and even given controlling weight, are (a) the existence of another remedy, such as a

right in ordinary course to an appellate review in the criminal case; and (b) a prior refusal to discharge on a like application."

See also 28 U.S.C. § 2244.[4] And compare the doctrine uniformly followed in the federal courts that a federal prisoner may not relitigate under 28 U.S.C. § 2255 matters previously determined on direct appeal. See, *e.g.*, Stein v. United States, 9 Cir., 1968, 390 F.2d 625, 626; Dirring v. United States, 1 Cir., 1967, 370 F.2d 862, 864; Wapnick v. United States, 2 Cir., 1966, 355 F.2d 136, 138–139; Medrano v. United States, 9 Cir., 1963, 315 F.2d 361, 362, cert. denied, 375 U.S. 854, 84 S.Ct. 114, 11 L.Ed.2d 81; Davis v. United States, 7 Cir., 1963, 311 F.2d 495, cert. denied, 374 U.S. 846, 83 S.Ct. 1906, 10 L.Ed.2d 1067.

■ The principal questions here presented were also fully presented, argued and decided in the New York case. Judge Dooling's decision is not patently erroneous; it was affirmed on appeal, certiorari was denied. As to the questions presented in that case, Winters has had his full day in court. The trial judge properly gave Judge Dooling's decision controlling weight.

2. *Other contentions.*

Winters claims that his reactivation was part of some sinister plot to prevent his access to the courts, that it constitutes a denial of due process and equal protection, and that it constitutes double jeopardy. These contentions were not raised in the New York litigation, and the trial judge in our case rejected them on the merits. His decision was correct.

Winters has cited no case which holds that active military service constitutes "jeopardy" under the constitution and we have found none. This contention is without merit.

■ On the due process and equal protection issue, Winters contends that 10 U.S.C. § 673a prohibits the ordering

---

4. Section 2244 is a statutory enactment of the *Salinger* principle. It was not intended to change the law as judicially evolved.

Sanders v. United States, 1963, 373 U.S. 1, 11, 83 S.Ct. 1068.

of a reservist to active duty twice for the same conduct which constitutes unsatisfactory participation. That statute makes no mention of the subject. The District Judge found that appellant's discharge from active duty was an administrative error, the result of confusion caused by the numerous modifications and cancellations of appellant's active duty orders. This finding was not clearly erroneous. Section 673a does not prohibit reactivation of a reservist to rectify an administrative error such as occurred here, and the prompt reactivation of Winters in this case cannot be held to have been a denial of his due process or equal protection rights.

■ Winters attacks Marine Corps Bulletin 1001R, which prescribed 100% participation in reserve drills, as violating the provisions of 10 U.S.C. § 277.[5] This point was not raised in the New York litigation. He contends that this statute prevents Marine reservists from being required to attend 100% of reserve drills while reservists in other branches of the armed forces must attend only 90% of their reserve drills. But this statute is inapplicable; it applies only to "laws applying to both Regulars and Reserves."

■ Winters argues that the Commandment of the Marine Corps had no authority to issue M.C. Bulletin 1001R.

This is completely without merit. By DOD Directive 1215.5, the Secretary of Defense authorized the Secretaries of the military departments to establish criteria for their minimum reserve training requirements, and in no event to permit more than 10% unexcused absences from reserve drills. By SECNAV Instruction 1001.7 (February 27, 1956), the Secretary of the Navy instructed the Commandant of the Marine Corps to supplement DOD Directive 1215.5 by issuing supplemental directives.

■ Winters argues that it was unconstitutional to apply P.L. 89–687 to him, because his enlistment contract and Statement of Understanding provided that the only sanctions for unsatisfactory performance of his reserve duty would be 45 days of additional active duty for training or accelerated induction by the Selective Service System. Appellee admits that Winters did not urge this claim before the New York federal district court, but points out that Judge Dooling, in upholding the validity of appellant's active duty orders, did expressly decide that P.L. 89–687 was constitutionally applicable to pre-existing enlistments such as Winters', 281 F. Supp. at 295–296.[6] Consequently, the trial judge did not err in giving controlling weight to Judge Dooling's decision on this issue.

Affirmed.

---

5. 10 U.S.C. § 277. *Regular and reserve components: Discrimination prohibited.* Laws applying to both Regulars and Reserves shall be administered without discrimination—
   (1) among Regulars;
   (2) among Reserves; and
   (3) between Regulars and Reserves.

6. All reported cases are in accord. See Pfile v. Corcoran, D.Colo., 1968, 287 F. Supp. 554; Even v. Clifford, S.D.Cal., 1968, 287 F.Supp. 334. *Cf.* Fox v. Brown, 2 Cir., 1968, 402 F.2d 837, 841, affirming S.D.N.Y., 1968, 286 F.Supp. 855; Ali v. United States, C.D.Cal., 1968, 289 F. Supp. 530. See also the following cases dealing with the call-up of entire reserve units: Sullivan v. Cushman, D.Mass. 1968, 290 F.Supp. 659; Linsalata v. Clifford, S.D.N.Y., 1968, 290 F.Supp. 338; Goldstein v. Clifford, D.N.J., 1968, 290 F. Supp. 275; Morse v. Boswell, D.Md., 1968, 289 F.Supp. 812, aff'd per curiam, 4 Cir., 1968, 401 F.2d 544, petition for cert. filed, 1968, 393 U.S. 1052, 89 S.Ct. 687, 21 L.Ed.2d 694.
   The only contrary decision of which we are aware is an unreported one of Judge Crary in the United States District Court for the Central District of California, Gion v. McNamara, Civ.No.67–1563–EC, January 9, 1968.